P]IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JONATHAN F. PEABODY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.  05-C-5026 |
| v. | ) | |
| | ) | |
| ANDREW A. DAVIS, ROBYN E. KOLE, | ) | HONORABLE DAVID H. COAR |
| ROCK ISLAND SECURITIES, INC., THE | ) | |
| ROCK ISLAND COMPANY OF | ) | |
| CHICAGO, and THE ROCK ISLAND | ) | |
| SECURITIES, INC. SALARY SAVINGS | ) | |
| PLAN, LIBERTY MUTUAL SURETY, and | ) | |
| THE HANOVER INSURANCE CO., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jonathan F. Peabody ("Peabody" or "Plaintiff") brought this action against

Defendants Andrew A. Davis ("Davis"), Robyn E. Kole ("Kole"), Rock Island Scurities, Inc.

("RIS"), The Rock Island Company of Chicago ("RIC"), and the Rock Island Securities, Inc.

Salary Savings Plan ("the Plan") (collectively "Rock Island Defendants"), according to rights

and duties created by Employee Retirement Income Security Act ("ERISA") and common law.

The instant matter proceeded to bench trial on October 30, 2006.  At the close of trial, both

parties submitted post-trial memoranda on the subject of liability.  Based on the trial, and parties'

pre-trial and post-trial submissions, the Court makes the following findings of fact and

conclusions of law.  To the extent that any findings may be deemed conclusions of law, they

shall also be considered conclusions; to the extent that any conclusions may be deemed findings

of fact, they shall also be considered findings.  *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985).

## I.    FINDINGS OF FACT

### A.    Parties

1.    Peabody is a citizen of Illinois, residing at the time of trial at 1875 North Fremont Street, Chicago, Illinois 60614.

2.    RIC is a Delaware corporation, maintaining an office in Chicago, Illinois at all relevant times.

3.    RIS was owned by RIC and also maintained an office in Chicago, Illinois at all relevant times.

4.    Defendants Andrew A. Davis ("Davis") and Robyn E. Kole ("Kole") were co-founders of RIS.

5.    Defendant Andrew A. Davis ("Davis") was an employee, Chief Executive Officer, Chairman of the Board, and majority shareholder of RIC.

6.    Defendant Robyn E. Kole was an employee of RIC, who worked for the company as a member of the board of directors, Chief Financial Officer, and, beginning in 2002, President. Prior to 2002, she acted in the capacity of Chief Operating Officer.

7.    At all relevant times, RIC and RIS were closely held corporations, effectively controlled by Davis and Kole.

### B.    Stock in RIC

8.    RIC had several dozen shareholders.

9.    RIC maintained a list of stock transactions, reflecting the prices that it paid for the stock.

10.     Davis, with some assistance from Kole, determined the price of RIC stock, typically expressed in round numbers.

11.    In Spring of 2000 Davis sold or alienated 50 shares of RIC stock he held outside the Plan for $5,000 per share.

12.    In April 2001, Davis obtained a valuation of RIC stock of $757 per share for RIC stock that he had given to a tax exempt college in 2000, for the purpose of Davis's personal tax reporting.

13.     There is little to no evidence of the process by which Davis and Kole
        valued the RIC stock.

14.     There is little evidence of the fair market value of RIC stock at any
        relevant time.

15.     During discovery, Peabody identified experts on the subject of valuation,
        all of whom were barred as a result of his failure to comply with Federal
        Rule of Civil Procedure 26.

**C.      The ERISA Plan**

16.     From 1993 through at least the date of trial, RIS sponsored the Rock
        Island Securities, Inc. Salary Savings Plan ("the Plan"), and was
        responsible for appointing and monitoring the work of Plan trustees.

17.     As discussed in greater detail below, the Plan is an employee benefit plan
        within the meaning of ERISA, 29 U.S.C. § 1002(3), and is a defined
        contribution plan within the meaning of 29 U.S.C. § 1002(34).

18.     At all relevant times, Davis and Kole were trustees and fiduciaries of the
        Plan.

19.     In their administration of the Plan and trust, Davis and Kole did not rely
        on, and had no contact with, legal counsel familiar with employee benefits
        law.

20.     Davis and Kole, as administrators of the Plan, relied on the assistance of
        an outside record-keeping firm, Shievetz Enterprises, and particularly
        Arthur Shievitz and Geri Leland of that company.

21.     As of December 1992, until December 31, 2001, the Plan consisted of a
        Basic Plan Document, an Adoption Agreement for employers to select
        specific plan features when they adopt the Basic Plan Document, a trust
        document, and a Summary Plan Description.  These documents controlled
        when Peabody became a Plan participant.

22.     Beginning January 1, 2002, and in effect through the present, the Plan
        consists of documents including a Basic Plan Document, an amended
        Adoption Agreement, an amended trust document, and Summary Plan
        Description.

23.     Under the Adoption Agreement in place when Peabody became a Plan
        participant, rollover contributions were permitted.  Beginning January 1,
        2002, rollover contributions were no longer permitted.

24.    Davis , Kole, RIS and RIC failed to provide the original Plan documents in discovery.

25.    Under the document entitled Restricted Stock Agreement, upon an employee's termination, RIC was granted the option to repurchase an employee's stock at book value, but employees had no corresponding right to sell the stock back to the RIC.

**D.    Peabody's Employment and involvement with the Plan**

26.    Peabody was employed by RIC from April 1, 1998 to January 30, 2004.

27.    Peabody was never a trustee or fiduciary of the Plan.

28.    Upon being hired by RIC in 1998, Peabody was given the option of purchasing RIC stock and/or participating in the Plan.  He neither participated in the Plan nor purchased stock in RIC during his first 18 months of employment.

29.    Peabody received a bonus of $30,000 from RIC in 1998.

30.    In 1999, Peabody was not contractually entitled to a bonus.  Nonetheless, that year Davis told Peabody that RIC was going to give him a bonus, payable in cash and RIC stock.  Peabody responded that he wanted his entire bonus paid in cash, and did not want any portion paid in RIC stock. Peabody suggested that he rollover his IRA from his previous place of employment into the Plan, in exchange for receiving his full bonus payment in cash.  Davis agreed.  Peabody instructed National Financial Services Corporation ("National Financial") to roll his IRA from previous employment into the Plan.  This rollover took the form of two checks from National Financial to the Plan, one issued on December 17, 1999 for $109,033.84, and another issued on February 14, 2000 for $58.785.58. The total rollover sum was $167,819.42.

31.    The rollover funds were used to purchase RIC stock, held in the Plan for Peabody's benefit; $108,000 for 54 shares at $2,000 per share on December 20, 1999, and $58,000 for 29 shares at $2,000 per share on February 23, 2000.   Peabody understood that the funds were to be used to purchase RIC stock.

32.    In 1999, Peabody received a cash bonus in excess of $212,000.

33.    In April 2000, there was a 10 for 1 stock split, which resulted in 830 shares being credited to Peabody's Plan account.

34. In April 2001, Kole told Peabody that Davis wanted all employees to purchase more RIC stock. Peabody agreed, telling Kole that he wanted a small sum of cash remaining in his Plan account to be used to purchase stock. The Plan then purchased 5 shares of RIC stock for $500 per share on Peabody's behalf.

35. Peabody received a benefit statement dated December 31, 2001 valuing his shares at $625 per share. Peabody received a benefit statement dated December 31, 2002, valuing his shares at $625 per share again.

36. On November 8, 2004, Peabody received a benefit statement dated December 31, 2003, valuing his shares at $460,489.03, indicating an effective per share value of $550.

37. To this day, there is also a Vanguard account held in the Plan under Peabody's name, valued at $10,703.80 as of December 31, 2004.

**E.     Later changes to Plaintiff's Plan holdings**

38. Peabody's employment was terminated on January 30, 2004.

39. In 2004, RIC offered to purchase the Peabody Shares on one of three terms: First, if Peabody wanted to sell the Peabody Shares on April 1, 2004, RIC offered to purchase the Peabody Shares for $215 per share, Second, if Peabody was willing to defer selling the Peabody Shares until January 15, 2005, RIC offered to purchase the Peabody Shares for $300 per share. Third, if Peabody was willing to defer selling the Peabody Shares until January 15, 2007, RIC offered to purchase the Peabody Shares for $400 per share. ("Purchase Proposal"). Peabody rejected all of these proposals

40. As a result of additional discussions, and as memorialized in a letter dated April 12, 2004, RIC offered to purchase all stock held in the Plan on Peabody's behalf with a loan to RIC ("the Loan"). The Loan was calculated at a per-share value of $350. It was intended to commence on or about February 1, 2004, and to be repaid in a single payment of $292,250.00, plus quarterly interest calculated at prime rate, on February 1, 2005.

41. In a letter dated January 31, 2005, Peabody notified Davis that he wished the payment to be sent via wire transfer, and included the relevant account information.

42. In a letter dated March 1, 2005, RIC advised Peabody that it was unable to meet its obligations under the Loan.

43.    On or about March 15, 2005, Davis and Kole conducted a meeting of RIC's creditors, including Peabody. Davis and Kole prepared and distributed a sheet showing the various debts of RIC, showing RIC was not creditworthy.

44.    In a letter to Davis and Kole dated March 18, 2005, Peabody demanded that his benefit be distributed

45.    In a letter dated March 21, 2005, Kole again stated that the Loan could not be repaid at that time, but included forms by which he could seek a distribution of his benefit or a rollover of his Plan account.

46.    By letter dated February 22, 2006, Kole requested the Trustees' insurance broker to lower the level of coverage of the Plan's ERISA-mandated dishonesty bond from $400,000 to $200,000.

47.    Sometime after January 29, 2005, Davis and Kole lost control of many Plan documents.

## F.    Insurance

48.    As required under ERISA, Plan officials were bonded for protection against trustee or fiduciary fraud and/or mismanagement. *See* 29 U.S.C. § 1112.

49.    On February 22, 1997, Peerless Insurance Company, a predecessor to Liberty Mutual Surety, issued a commercial crime policy to Rock Island Securities, Inc. Salary Savings Plan ("Plan"). A true and correct copy of the policy issued on February 22, 1997 is Joint Exhibit l. This policy was renewed on February 22, 2000, and ultimately expired on February 22, 2003. A true and correct copy of this policy in effect from February 22, 2000 through February 22, 2003 is Joint Exhibit 3. Joint Exhibit I and Joint Exhibit 3 are collectively referred to as the "Liberty Bonds."

50.    The Liberty Bond in effect from February 22, 1997 to February 22, 2000 had a $60,000 limit of liability. On November 5, 1998, Liberty issued an endorsement increasing the limit of liability to $120,000, a true and correct copy of which is Joint Exhibit 2. On September 18, 2000, Liberty issued an endorsement increasing the limit of liability on that Liberty Bond to $500,000, a true and correct copy of which is Joint Exhibit 4. Upon renewal of that Liberty Bond on February 22, 2000, the limit of liability was reduced to $250,000. From February 22, 2000 to February 22, 2003, the Liberty Bond had a $250,000 limit of liability,

51      On February 22, 2003, Hanover Insurance Company issued a commercial crime policy to the Plan. A true and correct copy of this policy, which is hereinafter referred to as "Hanover Bond," is Joint Exhibit 5.

52.     The Hanover Bond originally had a $400,000 limit of liability. On February 22, 2006, Hanover, at the request of Robyn Kole, reduced the limit of liability to $200,000. A true and correct copy of the letter requesting this reduction is Joint Exhibit 6, and a true and correct copy of the endorsement memorializing this reduction is Joint Exhibit 7.

53.     Metro/Plaza Agency, Inc., an insurance broker in Illinois, obtained the Hanover Bond and Liberty Bonds for the Plan.

54.     The Plan's mailing address, according to the Hanover Bond and Liberty Bonds, was 175 West Jackson Boulevard in Chicago, Illinois.

55.     The Hanover Bond and Liberty Bonds (collectively referred to herein as "Bonds") are identical in all material respects.

56.     The Bonds state that "this insurance is for [the Plan's] benefit only. It provides no rights or benefits to any other person or organization." (Joint Exh. 1, General Crime Provisions, § B.14; Joint Exh. 3, General Crime Provisions, § B.14; Joint Exh. 5, General Crime Provisions, § B.13).

57.     The Bonds state that the insurers will "pay for loss of, and loss from damage to, Covered Property resulting directly from the Covered Cause of Loss." (Joint Exh. 1, Employee Dishonesty Coverage Form, § A; Joint Exh. 3, Employee Dishonesty Coverage Form, § A; Joint Exh. 5, Employee Dishonesty Coverage Form, § A).

58.     The Bonds define "Covered Cause of Loss" as "employee dishonesty." (Joint Exh. 1, Employee Dishonesty Coverage Form, § A.2; Joint Exh. 3, Employee Dishonesty Coverage Form, § A.2; Joint Exh. 5, Employee Dishonesty Coverage Form, § A.2).

59.     The Bonds define "employee dishonesty" as:

        ... dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons, except you or a partner, with the manifest intent to:

        (1) Cause you to sustain loss; and also

        (2) Obtain financial benefit (other than employee benefits earned in the normal course of employment, including: salaries, commissions, fees,

bonuses, promotions, awards, profit sharing or pensions) for:

a. The "employee"; or

b. Any person or organization intended by the "employee" to receive that benefit.

(Joint Exh. l, Employee Dishonesty Coverage Form A, § D.3.a; Joint Exh. 3, Employee Dishonesty Coverage Form A, § D.3.a; Joint Exh. 5, Employee Dishonesty Coverage Form, § D.3.a).

60. The Bonds state that "[s]ubject to the Loss Sustained During Prior Insurance Condition," the Insurers will "pay only for loss that you sustain through acts committed or events occurring during the Policy Period." (Joint Exh. 1, Crime General Provisions, § B.15.b; Joint Exh. 3, Crime General Provisions, § B.15.b; Joint Exh. 5, Crime General Provisions, § B.14.b).

61. The Bonds state that the Insurers "will pay only for covered loss discovered no later than one year from the end of the policy period." (Joint Exh. 1, Crime General Provisions, § B.4; Joint Exh. 3, Crime General Provisions, § B.4; Joint Exh. 5, Crime General Provisions, § B.5).

62. The Bonds include a cancellation provision that provides:

[t]his insurance is cancelled as to any "employee":

a. Immediately upon discovery by:

(1) You; or

(2) Any of your partners, officers or directors not in collusion with the "employee";

of any dishonest act committed by that "employee" whether before or after becoming employed by you.

b. On the date specified in a notice mailed to you, That date will be at least 30 days after the date of mailing,

The mailing of notice to you at the last mailing address known to us will be sufficient proof of notice. Delivery of notice is the same as mailing.

(Joint Exh. 1, Employee Dishonesty Crime Form, § D.2; Joint Exh. 3, Employee Dishonesty Crime Form, § D,2; Joint Exh. 5, Employee Dishonesty Crime Form, § D.2).

63. The Bonds include a provision regarding the provision of notice of a claim and submission of a proof of loss, which states:

After you discover a loss or a situation that may result in loss of, or loss from damage to, Covered Property you must:

a. Notify us as soon as possible.
b. Submit to examination under oath at our request and give us a signed statement of your answers.
c. Give us a detailed, sworn proof of loss within 120 days,
d. Cooperate with us in the investigation and settlement of any claim.

(Joint Exh. 1, Crime General Provisions, § B.5; Joint Exh, 3, Crime General Provisions, § B.5; Joint Exh. 5, Crime General Provisions, § B.4).

64. The Bonds contain a provision regarding filing a legal action against the Insurers, which provides:

You many not bring any legal action against us involving loss:
a. Unless you have complied with all the terms of this insurance; and
b. Until 90 days after you have filed proof of loss with us; and
c. Unless brought within 2 years from the date you discover the loss. But we will extend this 2 year period by the number of days between the date proof of loss is filed and the date the claim is denied in whole or in part.

(Joint Exh. 1, Crime General Provisions, § B.7; Joint Exh. 3, Crime General Provisions, § B.7; Joint Exh. 5, Crime General Provisions, § B.7).

65. The Bonds state that the Insurers will not pay for loss that is an indirect result of any act or "occurrence" covered by this insurance including, but not limited to, loss resulting from:

a. Your inability to realize income that you would have realized had there been no loss of, or loss from damage to, Covered Property.
b. Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this insurance,
c. Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this insurance.

(Joint Exh, 1, Crime General Provisions, § A.3; Joint Exh. 3, Crime General Provisions, § A.3; Joint Exh. 5, Crime General Provisions, § A.3).

66. The Bonds state that the Insurers will not pay for loss "[e]xpenses related to any legal action." (Joint Exh. 1, Crime General Provisions, § A.4; Joint Exh. 3, Crime General Provisions, § A.4; Joint Exh. 5, Crime General Provisions, § A.4).

67. The Bonds state that they were issued "[i]n compliance with certain provisions of the Employee Retirement Income Security Act . . . ." (Joint Exh. 1, Welfare and Pension Plan ERISA Compliance Endorsement; Joint Exh. 3, Welfare and Pension Plan ERISA Compliance Endorsement; Joint Exh. 5, Welfare and Pension Plan ERISA Compliance Endorsement).

68. On September 12, 2006, Peabody notified Hanover Insurance Company of a possible claim under the Hanover Bond.

69. On September 12, 2006, Peabody notified Liberty Mutual Surety of a possible claim under the Liberty Bond.

70. Peabody submitted a proof of loss to Hanover Insurance Company on October 4, 2006.

71. Peabody submitted a proof of loss to Liberty Mutual Surety on October 4, 2006.

72. On October 16, 2006, Peabody filed a complaint against the Insurers, seeking recovery under the Bonds.

## G.  Procedural History

73. Peabody filed this Complaint on August 31, 2005, seeking recovery from the Rock Island Defendants.  In it, Plaintiff alleged the following:

| | |
|---|---|
| Counts I & IX: | Davis and Kole's (respectively) Violation of Plan Terms, for executing the rollover, in violation of 29 U.S.C. § 1104(a)(1)(D). |
| Counts II & X: | Davis and Kole's First Violation of Duty of Loyalty, for executing the rollover, in violation of 29 U.S.C. § 1104(a)(1)(A). |
| Counts III & XI: | Davis and Kole's Second Violation of Duty of Loyalty, for withholding the benefit distribution, in violation of 29 U.S.C. § 1104(a)(1)(A). |
| Counts IV & XII: | Davis and Kole's Violation of Duty of Prudence, for investing in RIC stock and |

|                        | extending credit to RIC in the form of the Loan, in violation of 29 U.S.C. § 1104(a)(1)(B). |
|------------------------|---------------------------------------------------------------------|
| Counts V & XIII:       | Davis and Kole's Violation of Duty of Diversify, for investing Plan funds only in RIC stock and later transacting the Loan, in violation of 29 U.S.C. § 1104(a)(1)(C). |
| Counts VI & XIV:       | Davis and Kole's First Violation of Prohibited Transaction Rules, for paying more than adequate consideration for the RIC stock on December 20, 1999 in violation of 29 U.S.C. §§ 1106, 1107, and 1108(e). |
| Counts VII & XV:       | Davis and Kole's Second Violation of Prohibited Transaction Rules, for paying more than adequate consideration for the RIC stock on February 23, 2000 in violation of 29 U.S.C. §§ 1106, 1107, and 1108(e). |
| Counts VIII & XVI:     | Davis and Kole's Third Violation of Prohibited Transaction Rules, for causing the Plan to sell back to RIC the stock purchased using the Plaintiff's Rollover and for extending credit to RIC in the form of the Loan, in violation of 29 U.S.C. § 1106. |
| Counts XVII & XVIII:   | Davis & Kole's Breach of Co-Fiduciary Duties, for failing to prevent the other from breaching, in violation of 29 U.S.C. § 1105. |
| Counts XIX & XX:       | RIS, RIC, and their Controlling Parties' Breaches of Fiduciary Duties for permitting Davis and Kole to remain in control of the Plan, in violation of 29 U.S.C. § 1104 |
| Count XXI:             | Joint and Several Liability to Plan of Davis, Kole, RIS, and RIC, for Breach of Fiduciary Duty regarding any losses to the Plan resulting from each breach, pursuant to 29 U.S.C. §1109. |
| Count XXII:            | Benefit Claim, for immediate payment of Plaintiff's Plan benefit plus appreciation, |

|  |  | interest, dividends, and other applicable growth, in an amount not less than $311,721.30. |
|  | Count XXIII: | Interference with ERISA Rights, in violation 29 U.S.C. § 1140. |
|  | Count XXIV: | Estoppel, due to Defendants' wrongful course of conduct, and Plaintiff's actions in reliance thereon, from denying Plaintiff full distribution of his Plan benefit. |
|  | Count XXV: | Federal Common Law Unjust Enrichment, in an amount not less than $311,721.30. |

74.  On September 12, 2006, Plaintiff notified Hanover and Liberty of a possible claim under the insurance companies' respective bonds (together "Insurer Defendants").  Peabody submitted a proof of loss to each of these parties on October 4, 2006.

75.  On October 16, 2006, Peabody filed an amended complaint, adding the Insurer Defendants as defendant parties and seeking recovery from them under their policies with the Plan.  This added the following two counts:

| Counts XXVI & XXVII: | Liability of Liberty and Hanover, under a fidelity bond held in the name of the Plan |

## II.  GOVERNING LAW

### A.  Jurisdiction and venue are both appropriate

Subject matter jurisdiction over this action is appropriate under 29 U.S.C. § 1132(e).

Venue is proper pursuant to 28 U.S.C. § 1132(b).

### B.  Law governing ERISA fiduciary actions

In order to establish that a breach of fiduciary duty under ERISA, a plaintiff must show

that: (1) defendants are plan fiduciaries; (2) defendants breached their fiduciary duty; and (3) the

breach caused harm to the plaintiff.  *Kamler v. H/N Telecomm. Servs.*, 305 F.3d 672, 681 (7th

Cir. 2004).  It is therefore necessary to determine, with respect to each of the contested actions

related to the management of the Plan, whether the Plaintiff successfully met all of the necessary elements of its various breach claims.

1.   Whether the party is acting as a fiduciary

ERISA defines a fiduciary as follows:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.  29 U.S.C. § 1002(21)(A).

A party's status as a fiduciary is not determined by a rigid formula. Rather, the court looks to the extent that the party exercised control or authority over the management or administration of the plan. See *Ruiz v. Continental Casualty Co*., 400 F.3d 986, 990 (7th Cir. 2005).  It is uncontested that Defendants Davis and Kole were fiduciaries.

2.   Whether the action represents a breach

ERISA sets forth a number of fiduciary duties, the violation of which constitute a breach. *See* 29 U.S.C. § 1104(a). These duties are rooted in the common law of trusts, though the Supreme Court has described the comparison as "problematic" because the common law assumes that a trustee "wears only his fiduciary hat when he takes action to affect a beneficiary, whereas the trustee under ERISA may wear different hats." *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000).

3.   Whether the breach caused harm to the Plaintiff.

Finally, in order to obtain relief, the Seventh Circuit requires a Plaintiff to show that the breach of fiduciary duty caused him harm.  *Kamler,* 305 F.3d at 681.

## II. CONCLUSIONS OF LAW

### A. The rollover of Plaintiff's IRA funds into the Plan was not a violation of Plan terms (Counts I and IX)

Plaintiff claims that the rollover of his IRA funds into the Plan constituted a violation of the Plan terms, citing the amended Adoption Agreement. Under ERISA law, a fiduciary must discharge his duties in accordance with the documents and instruments governing the plan. 29 U.S.C. § 1104(a)(1)(D). The original Adoption Agreement, which permitted rollover contributions, applied when Peabody became a Plan participant in 1999. The amended Adoption Agreement, which prohibited rollover contributions, only applied to plans beginning January 1, 2002 onward. Plaintiff is therefore incorrect that the rollover violated Plan terms.

As a result, we find in Defendants' favor on Counts I and IX.

### B. The rollover of Plaintiff's IRA funds into the Plan does not represent a breach of fiduciary duty on the part of Davis and Kole (Counts II and X)

As stated in open court, the decision to roll over Plaintiff's other retirements benefits into the Plan did not violate their fiduciary duty under 29 U.S.C. § 1104(a)(1)(A). Davis and Kole, respond that they acted solely in Plaintiff's interest, and that Plaintiff directed them to execute the rollover, thereby waiving any claim under ERISA.

Defendants cite a number of cases in which trustees' ratification of transactions resulted in a waiver of their claims against ERISA co-fiduciaries. *See Meyer v. Berkshire Life Ins. Co.,* 128 F. Supp. 2d 831 (D. Md. 2001); *McManus & Pellouchoud v. L.F. Rothschild,* No. 87 C 465, 1989 WL 100103 (N.D. Ill., Aug. 23, 1989); *Schetter v. Prudential*, 695 F. Supp. 1077 (E.D. Ca. 1981). In *McManus*, the plan and its trustees sought to recover losses they sustained as a result of bad investments from a fiduciary brokerage. The Plan terms put ultimate responsibility on the

trustees for investing the trust assets, unless the trustees delegated their fiduciary responsibilities *in writing.* The trustees did not have such a written a document, and therefore maintained the responsibility for investment losses. The court held that because one of the trustees had approved of all investment decisions, the broker was not liable. *McManus,* 1989 WL 100103 at *4 ("Even the stringent duties imposed by ERISA do not create broker liability where the broker acts with the approval and at the direction of a plan Trustee, especially when the Trustee is a sophisticated investor who owns a majority interest in the Trust.").

Meyer, on the other hand, involves a claim brought by trustees who were also beneficiaries against the plan manager, alleging that the manager churned accounts and did not properly diversify investments. There, the court rejected the defendant's waiver defense, on the ground that the trustees, both physicians, were not sophisticated investors and they might have approved transactions without fully understanding them. *See Meyer,* 128 F. Supp. 2d at 841.

These cases are inapposite, as they involve the ratification of conduct by trustees who shared the responsibility for Plan administration. Here, Plaintiff had no responsibility for Plan administration. Additionally, conflicting authority suggests that plan trustees do not waive beneficiaries' right to have fiduciaries comply with the specific mandates of § 1104(a) when they fail to object to their co-fiduciaries' conduct. *See Dardaganis v. Grace Capital, Inc*., 889 F.2d 1237, 1241 (2nd Cir. 1989) (ruling that ratification was preempted as a defense because ERISA specifically forbade violations of plan terms, and therefore, "[a] rule of state contract law that would effectively vary the terms of the written document or permit trustees to waive the right of beneficiaries to strict adherence by fiduciaries would impair these federal policies"). Finally, in

*McManus*, the plan terms held the trustees responsible for investment decisions. Not only was there no such term in the instant Plan, but Plaintiff was not a fiduciary and therefore had no role in Plan administration.

There is a line of cases in which plan beneficiaries signed written releases waiving their rights under ERISA. *See, e.g., Frommert v. Conkright*, 535 F.3d 111 (2nd Cir. 2008); *Smart v. Gillette Co. Long-Term Disability Plan,* 70 F.3d 173 (1st Cir. 1995). In all of those cases, courts have ruled that the waiver must have been "knowing and voluntary" in order to be enforceable. *Frommert,* 535 F.3d at 121*, Smart,* 70 F.3d at 181. Furthermore, "[a] court should consider the totality of the circumstances in determining whether a waiver of ERISA rights is knowing and voluntary." *Frommert,* 535 F.3d at 121 (internal citations and quotation marks omitted).

Although Peabody did not sign a written release waiving all of his ERISA claims, he arguably waived any claim related to the rollover because he himself suggested it. Moreover, he obtained a benefit from the rollover because its execution was a *quid pro quo* in exchange for receiving his full bonus payment in cash, contrary to the company's general policy. He cannot be considered ignorant of the consequences of the rollover when those consequences motivated him to initiate it in the first place.

Finally, even if Peabody did not waive his ERISA claim by acquiescing in the rollover, there is no evidence that its execution was a breach of fiduciary duty. Plaintiff submitted no proof that RIC's financial condition was poor at the time of the rollover. Therefore, the Court cannot conclude that the rollover was not in Plaintiff's interest.

Consequently, Counts II and X are decided in favor of the Defendants.

**C. Davis and Kole's failure to distribute Plaintiff's Plan benefit in 2005 constituted a breach of fiduciary duty (Counts III and XI)**

Plaintiff argues that Davis and Kole violated their duty of loyalty under 29 U.S.C. § 1104(a)(1)(A) by withholding Plaintiff's benefit distribution in 2005, when his Loan repayment became due. On January 31, 2005, Plaintiff sent Defendant Davis a letter instructing him to fulfill the Loan obligations via a wire transfer. He further specified the account to which the payment should be wired. Defendants Davis and Kole responded with a letter on March 1, 2005, stating that RIC would be unable to meet its debt obligation. After Plaintiff responded with a letter on March 18, 2005, demanding that his benefit be distributed, Defendants sent another letter on March 21, 2005, restating that the Loan could not be repaid at that time, but enclosing documents by which it stated that Peabody could seek a distribution of his benefit or a rollover of his account. They now argue that Plaintiff failed to fill out these forms. But Plaintiff was under no obligation to do so; he became entitled to his payment in February 2005, and he already sent Defendants explicit instructions in January 2005 regarding the method in which he sought to be paid. Plaintiff had already provided all of the information required by the forms in his January 2005 letter. Furthermore, Defendants made clear in both the March 1 and March 21 letters that Plaintiff was not going to be paid at that time, regardless of whether he completed the forms. They cannot now argue that the reason that they failed to make the loan payment was Plaintiff's failure to complete the forms.

For this reason, Counts III and XI are decided in Plaintiff's favor.

**D. David and Kole breached their duty of prudence by continuing to hold RIC stock. Davis breached his duty of prudence by converting Plaintiff's RIC stock holding into a loan payable by RIC (Counts IV and XII)**

Plaintiff first alleges that both Davis and Kole, by investing the Rollover into RIC stock, violated their duty of prudence under 29 U.S.C. § 1104(a)(1)(B). The duty of prudence requires

a fiduciary to act in a manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  Plaintiff argues that Davis and Kole's continued holding of RIC stock from 2001 to 2003 was imprudent given its declining value.  Numerous courts have ruled that ERISA fiduciaries have an ongoing duty to monitor investments and remove investments that are no longer viable.  *See, e.g., RABER v. 3M*, 42 F. Supp. 2d 898, 906 (D. Minn. 1999) ("Once the investment is made, a fiduciary has an ongoing duty to monitor investments with reasonable diligence and remove plan assets from an investment that is improper"); *Liss v. Smith*, 991 F. Supp. 278 (S.D.N.Y. 1998); *Hunt v. Magnell*, 758 F. Supp. 1292, 1299 (D. Minn. 1991)("ERISA fiduciaries must monitor investments with reasonable diligence and dispose of investments which are improper to keep").

Defendants again argue that Plaintiff waived his claim by directing and ratifying the investment in RIC stock.  Although Plaintiff consented to the initial investment in RIC stock, he could not have given his knowing consent to its continued holding as he had no means of knowing about RIC's decline in stock price.  Because RIC is a closely-held company, its shares were not sold on the open market.  Davis and Kole together set the stock price, though even they could not describe the precise method they used to do so.  Furthermore, this information was not available to the Plaintiff.

We next consider whether Defendants' failure to modify Plaintiff's holding in light of RIC's declining stock price amounted to a breach of their duty of prudence.  In his December 31, 2003 Plan statement, Davis and Kole valued Plaintiff's plan account at a value of $550 per share.  Plaintiff did not receive this statement until November 8, 2004.  Defendants respond in their

post-trial briefing that this reflected the "net asset value" of Plaintiff's shares, which was a price per share they set based on their estimate of the overall value of all company's stock should it be sold. They argue that this should be contrasted with the fair market value of the stock, because Plaintiff was a minority shareholder. On the other hand, they argue that $215 was the "book value" of RIC stock in January 2004, or the value of RIC's assets minus liabilities divided by the number of shares. Finally, Defendants also note in their post-trial briefing "that fair market value requires a willing buyer and willing seller such that, whatever price RIC and Peabody agreed upon would by definition be a fair market price."

These explanations are disingenuous. Davis testified at trial that Plan statements reflected net asset value because, even though the company was entitled to purchase stock at book value by the restricted stock agreement, the company, "traditionally and…without exception" bought stock at a higher price, and "other folks who bought stock and other folks who sold stock bought and sold it at this price that…myself would help arrive at as being our view of the market value." (Tr. at 141). According to Davis' own testimony, then, the net asset value did not deviate from the fair market value in practice.

Regardless, what can be concluded without a doubt is that the fair market value of RIC stock was $500 in April 2001, when the Plan purchased five shares of RIC stock on Plaintiff's behalf. Furthermore, Defendants themselves say that any price RIC and Peabody agreed upon was the fair market price. Because they agreed that the stock would be sold on February 1, 2004, in return for a Loan to be repaid on February 1, 2005 at a price of $350 per share, the fair market value of RIC stock had declined to less than $350 per share between 2001 and January 2004.[1]

_____

[1] The price was less than $350 per share in 2004 because the price negotiated under the

-19-

This is a substantial decline, and a prudent man would not have continued holding all of a Plan's assets in RIC stock under such conditions.

Plaintiff further argues that Davis breached his duty of prudence by converting Plaintiff's stock into a loan, rather than buying back the stock. Defendant Davis again argues that Plaintiff ratified this decision, thereby waiving his claim under ERISA. He further argues that the decision benefitted Plaintiff because he would have better standing for recovery purposes as a creditor than a shareholder. That a creditor has a prior claim to assets over a shareholder is undisputed. However, this assumes that, given the declining value of the stock, there would be assets from which to satisfy the claim and that the loan would be paid when due. As a fiduciary, Davis had the burden to demonstrate that this was not the case and he failed to so. Indeed, Plaintiff has never received payment on account of the Loan. Furthermore, Plaintiff's waiver could not have been knowing and voluntary given that he was not apprised of the financial situation of the company at that time. If he had known that there was a significant possibility that RIC would default on the loan, he would have certainly opted to sell his stock immediately instead of agreeing to the loan. Davis, on the other hand, was fully aware of RIC's debt obligations. A prudent man would not have converted Plaintiff's stock into a loan given the risk of default.

Consequently, Counts IV and XII are decided in Plaintiff's favor.

### E. Davis and Kole did not breach their duty to diversify Plan assets (Counts V and XIII)

Plaintiff claims that Davis and Kole's failure to diversify his Plan assets was a breach of

---

Loan must have reflected the benefit to RIC from the time-value of the money.

their fiduciary duty of loyalty under § 1104(a)(1)(C). Defendants respond that Plaintiff ratified this decision, thereby waiving his claim under ERISA. I understand Plaintiff to be making a different argument here than he did with respect to Counts IV and XII, in that he is now complaining of Defendants' initial investment in RIC stock, as opposed to their failure to reassess the Plan's holdings in light of RIC's decline in stock price.

Here, again, Plaintiff's consent to the initial investment in RIC stock amounted to "knowing and voluntary" waiver of his claim. As stated earlier, Plaintiff not only knew that Defendants' would invest all of his holdings in RIC stock, he himself suggested it. Furthermore, he benefited by receiving his stock payment in cash in return.

Therefore, Counts V and XIII are decided in Defendants' favor.

**F. Plan Defendants violated their fiduciary obligations when valuing and purchasing Plaintiff's shares in RIC (Counts VI, VII, XIV, and XV)**

Plaintiff further accuses Plan Defendants of breaching their fiduciary duties in their valuation and purchase of RIC stock subsequent to each of the Rollovers. Davis and Kole were responsible for both purchasing the RIC stock after each Rollover, as well as determining the sale price of the RIC stock. They have been unable to provide details as to the factors that they relied upon in determining the price of RIC stock. Conflicts of interest may be acceptable in the case of a closely-held company such as RIC, even if those conflicts pit a fiduciary's personal interest in maintaining company viability against the personal interest of plan beneficiaries, so long as the employer was not acting in his capacity as a fiduciary by undertaking management or administration of the Plan. *See Navarre v. Luna (In re Luna),* 406 F.3d 1192, 1207 (10th Cir. 2005). However, Plan Defendant's purchase of shares clearly amounted to management and administration of the Plan, thereby triggering their duties as fiduciaries. Defendants' purchase of

stock at a value that they themselves had *arbitrarily* designated clearly fell short of the diligent standard of conduct required under ERISA.  Therefore, Counts VI, VII, XIV, and XV are decided in Plaintiff's favor.

### G.  Davis and Kole's execution of the loan transaction was a prohibited transaction (Counts VIII and XVI)

Plaintiff alleges that the Loan executed by Davis and Kole following their sale of Plaintiff's RIC stock was a prohibited transaction under 29 U.S.C. § 1106.  That section prohibits fiduciaries from causing a plan to engage in five transactions, either directly or indirectly:

> (A)  sale or exchange, or leasing, of any property between the plan and a party in interest
>
> (B)  lending of money or other extension of credit between the plan and a party in interest
>
> (C)  furnishing of goods, services, or facilities between the plan and a party in interest
>
> (D)  transfer to, or use by or for the benefit of a party in interest, of any assets of the plan
>
> (E)  acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a)(1).  In their post-trial briefs, the Plan Defendants argue, without authority, that the conversion of an equity interest to a loan interest is not a violation of any ERISA provision.  But ERISA's prohibition against such an arrangement is clear; § 1106(a) bars fiduciaries from causing the plan to engage in transactions that "directly or *indirectly*" constitute the "lending of money or other extension of credit between the plan and a party in interest."  29 U.S.C. § 1106(a) (emphasis added).  It is therefore irrelevant that the Loan was executed after the conversion of Peabody's equity interest.  Furthermore, Plaintiff cannot be said to have "knowingly and voluntarily" consented to the prohibited Loan transaction, when he was not apprised of RIC's numerous debt obligations and the risk of default inherent in the Loan.  The

Court therefore finds that the Plan Defendants failed to satisfy their fiduciary duties when they converted the RIC stock to a loan.

Counts VIII and XVI are thus decided in Plaintiff's favor.

**H. Davis and Cole breached their co-fiduciary duties by failing to prevent the other from breaching their fiduciary duties (Counts XVII and XVIII)**

Plaintiff alleges that, to the extent that Davis and Kole were aware of one another's breaches of fiduciary duties, they violated 29 U.S.C. § 1105 and are equally liable for the other's breaches. Under that section, a fiduciary is liable for any fiduciary's breaches:

> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2)    if, by his failure to comply with section 404(a)(1) [29 USCS § 1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a). Plaintiff contends that Davis and Kole meet these requirements because they jointly controlled RIC and were co-fiduciaries of the Plan from its inception. Davis and Kole do not contest their co-fiduciary liability. Because Davis and Kole jointly administered the Plan, and at the least were aware of the other's actions throughout the entire period, they are liable for one another's conduct. At no point did they make an effort to remedy the other's breach, and they were in fact complicit in making all relevant decisions pertaining to the Plan. Therefore, Counts XVII and XVIII are decided in Plaintiff's favor.

**I. Although RIC is not a fiduciary under RIS, RIS is a fiduciary. RIS breached its fiduciary duty by failing to remove Davis and Kole as Plan administrators during the period when they committed breaches of fiduciary duty. (Counts XX and XIX)**

Plaintiff maintains that RIS, by exercising control over the appointment of Plan trustees,

had discretionary control of the Plan and was therefore a fiduciary under 29 U.S.C. §

1002(21)(A).[2] Plaintiff also maintains that RIC, as the owner of RIS, indirectly controlled the

Plan and therefore should also be held to be one of its fiduciaries.

       1.       RIC is not an ERISA fiduciary

       Plaintiff makes no attempt to argue that RIC exercised any direct authority or control

over the Plan.  Rather, he contends that RIC is vicariously liable because it is the sole owner of

RIS, which had the power to assign or remove Davis and Kole as Plan administrators.  He offers

no legal support for this argument.  Determination of whether a given individual or entity was

acting as a fiduciary for ERISA purposes centers on a question of discretion.  *See Maniace v.*

*Commerce Bank of Kansas City,* 40 F.3d 264, 267 (8th Cir.  1994), *cert. denied,* 514 U.S. 111

(1995) ("Discretion is the benchmark for fiduciary status under ERISA"); *see also Pohl v.*

*National Benefits Consultants,* 956 F.2d 126, 129 ("ERISA makes the existence of discretion a

*sine qua non* of fiduciary duty"); *Pacificare, Inc. v. Martin*, 34 F.3d 384, (9th Cir. 1994) "[A]n

ERISA fiduciary includes anyone who exercises discretionary authority over the plan's

management, anyone who exercises authority over the management of its assets, and anyone

having discretionary authority or responsibility in the plan's administration").  While RIS clearly

had some control over the management of the Plan, Plaintiff has provided insufficient evidence

to show that liability can be extended to RIC via indirect or vicarious responsibility.  Having

---

[2]This section of ERISA defines the term "fiduciary" by stating in relevant part that such a party is one who "(i) ...exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) ...renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) ...has any discretionary authority or discretionary responsibility in the administration of such plan."

technical control over plan assets is insufficient to create fiduciary status.  *See Burtch v. Ganz (In re Mushroom Transp. Co.),* 382 F.3d 325 (3rd Cir. 2004).  Therefore, RIC is not a fiduciary of the Plan and all claims against it in the instant action are disregarded.  It should be noted that this determination ultimately turns on the apportionment of liability, rather than a decision with respect to any culpability, as Davis and Kole are the sole individuals involved in the management of both RIC and RIS; in that sense, questions of the level of "discretion" held by particular entities are convoluted at best.  Nonetheless, Plaintiff has provided insufficient bases for moving beyond the formal terms of the Plan, which do not include RIC as a fiduciary, by showing that RIC had any real discretionary authority.

Count XX is therefore decided in Defendant RIC's favor, as are the remaining claims against RIC.

2.   RIS is liable for breaches of fiduciary duty arising from its power to assign or remove Plan administrators

It is clear from Plan documents that RIS did indeed have the power, at its pleasure, to appoint and subsequently remove Plan administrators.  For that reason, and without any significant argument to the contrary from Defendants, there is no basis for finding RIS liability improper as a categorical matter.  *See Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 736 (7th Cir.1986) ("[I]n *Leigh v. Engle*, 727 F.2d 113 (7th Cir.1984), we held that fiduciaries responsible for selecting and retaining their close business associates as plan administrators had a duty to monitor appropriately the administrators' action.  Similarly, the corporate plaintiffs here may well have some duty to monitor the actions of the plan

administrator and the insurance company administering the Plan.");[3] *see also United States Steel Corp. v. Commonwealth of Pa. Human Relations Comm'n*, 669 F.2d 124, 126 (3rd Cir. 1982) (employer may be fiduciary when it has authority to alter terms of plan and authority to administer plan).  RIS, insofar as it had the power as a corporate entity to appoint or fire Davis and Kole as administrators, is therefore a fiduciary under ERISA.  *Sandoval v. Simmons*, 622 F.Supp. 1174, 1211 (C.D. Ill. 1985) (citing *Leigh, Dusek, Johnson v. Engle*, 727 F.2d 113 at 133 (7th Cir. 1984)).   The next consideration is whether RIS breached its fiduciary duty by permitting Davis and Kole to remain in control of the Plan in violation of 29 U.S.C. § 1104.

3.    RIS breached its fiduciary duty by permitting Davis and Kole to remain in control of the Plan during the period when they breached their fiduciary duties (Count XIX)

Plaintiff alleges that by failing to remove Davis and Kole as Plan administrators during the period when they breached their fiduciary duties under 29 U.S.C. § 1104, RIS breached its fiduciary duties under 29 U.S.C. §§ 1104(a)(1), 1105, and 1109.  RIS failed to respond to this argument.  Because RIS was under the sole control of Davis and Kole, it was clearly aware of and responsible for any of their breaches, and at no point did it attempt to remedy them.  RIS therefore breached its own fiduciary duty of loyalty under § 1104(a)(1), and is responsible as a co-fiduciary under § 1105.  § 1109, on the other hand, pertains to damages, which we will discuss in turn.

We therefore find in Plaintiff's favor on Count XIX.

**J.  Insurer Defendants are not liable (Counts XXVI and XXVII)**

---

[3]The fact that in this instance the directors of RIS were in fact the administrators of the Plan does not alter the fact that the Plan nonetheless implicated RIS itself as a fiduciary.

Hanover Insurance Company and Liberty Mutual Surety are not liable the Plaintiff because Plaintiff lacks standing to bring claims against them.  Consequently, Counts XXVI and XXVII are decided in favor of Defendants.

     1.    Plaintiff has no standing under ERISA to pursue claims against Insurer Defendants

At trial, this Court asked that Plaintiff provide post-trial briefing for the proposition that, as a Plan participant, he was authorized under ERISA to sue on behalf of the Plan due to failure on the part of the trustees to pursue a fidelity policy.   Plaintiff claimed standing to bring his ERISA claims against the Insurer Defendants based on 29 U.S.C. § 1132(a)(1)(B), (a)(2), and (a)(3).  However, Plaintiff has no standing under these – or any – ERISA sections.

Section 1132(a)(1)(B) states: "A civil action may be brought...by a participant or beneficiary...to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." However, actions for recovery of benefits under this section can only be brought against the Plan itself. *Anderson v. Illinois Bell Tel. Co.,* 961 F.Supp. 1208, 1212 (N.D. Ill. 1997).  This section therefore provides no basis for Plaintiff's attempt at civil enforcement against Liberty and Hanover.

Section 1132(a)(2) allows a participant to sue a fiduciary on behalf of the plan.  However, Insurer Defendants are not fiduciaries of the Plan.  A fiduciary is defined broadly as a party who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets...renders investment advice...or...has any discretionary authority or responsibility in the

administration of such plan."  29 U.S.C. § 1002(21)(A).

ERISA law envisages insurers such as Liberty and Hanover as being involved in Plan administration, through the requirement that Plan officials be bonded to provide "protection to the plan against loss by reason of acts of fraud or dishonesty on the part of the plan official directly or through connivance with others."  29 U.S.C. § 1112.

It is possible for an insurer to be a fiduciary of an ERISA plan, but only to the extent that they are given control over assets or plan administration.  *See, e.g., Peoria Union Stock Yards Co. Retirement Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320 (7th Cir. 1983) ("Congress did not want to make an insurance company that sells a standard annuity contract-one that provides 'benefits the amount of which is guaranteed by the insurer'-a fiduciary toward the purchaser of the contract. But that is not what Penn Mutual sold here. The pension trustees did not buy an insurance contract with a fixed payout; they turned over the assets of the pension plan to Penn Mutual to manage with full investment discretion, subject only to a modest income guaranty. If the pension plan had hired an investment advisor and given him authority to buy and sell securities at his discretion for the plan's account, the advisor would be a fiduciary within the meaning of the act, and that is essentially what the trustees did during the accumulation phase of the contract with Penn Mutual.").  In this instance, no evidence has been provided that the Insurer Defendants played any substantive role in Plan decision-making or administration that would warrant fiduciary status under the ERISA definition.  Therefore, they are not fiduciaries of the Plan, and are not responsible for a breach of fiduciary duties under ERISA law.

Furthermore, § 1132(a)(2) is concerned with remedies for harms to the Plan as a whole rather than the rights of individual beneficiaries.  *See Massachusetts Mutual Life Ins. Co. v.*

*Russell*, 473 U.S. 134, 142 (1985) (holding that Section 1132(a)(2) is "primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary").

Finally, section 1132(a)(3) allows for a civil action by a participant, beneficiary, or fiduciary "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." However, this section only enables equitable actions, which cannot include monetary damages. *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1491 (7th Cir. 1996). The equitable remedies sought by the Plaintiff here (e.g., removal of Davis and Kole as trustees) have nothing to do with Insurer Defendants. Furthermore, the Supreme Court has stated that, as 1132(a)(3) is a catchall provision, it is not to be applied where other remedies are available. *Varity Corp. v. Howe*, 516 U.S. at 515 ("where Congress elsewhere provided adequate relief for a beneficiary's injury," relief under section 1132(a)(3)] normally "would not be appropriate") (internal quotation marks omitted). As Plaintiff can recover through his claims against Davis, Kole, and RIC, section 1132(a)(3) is inapplicable.

Plaintiff argues that he has derivative standing to pursue claims under ERISA, but none of the cases he cites support the right of a plan participant to proceed against a third party. Instead, those cases support the right of plaintiffs to bring derivative suits against ERISA plans or fiduciaries on behalf of beneficiaries. *See Yarde v. Pan Am. Life Ins. Co.*, 840 F. Supp. 406 (D.S.C. 1994) (sole heir of deceased beneficiary has derivative standing to claim ERISA plan life insurance benefit); *James v. Louisiana Laborers Health & Welfare Fund*, 766 F. Supp. 530 (E.D.

La. 1991) (succession representative of participant who stands in shoes of participant has derivative standing); *Cottle v. Metropolitan Life Insurance Co.*, 1993 WL 8201 (N.D. Ill. 1993) (supporting plaintiff's derivative standing on behalf of a deceased beneficiary).

Although Plaintiff cites one case that affirmed the right of a plan participant to sue a non-fiduciary insurance company under 29 U.S.C. § 1132(a)(3)(B) to enforce and seek redress for violations of 29 U.S.C. § 1132(a)(3), *see Isola v. Hutchinson,* 780 F.Supp. 1299 (N.D. Cal. 1991), that case was decided before *Varity Corp.* and is not consistent with the Seventh Circuit's holding in *Jass*, which barred recovery of monetary damages under § 1132(a)(3).   Because Plaintiff has no remaining argument to support derivative standing against Insurer Defendants, his claims against them fail.

        2.   Adverse domination does not provide an exception to ERISA's standing requirement

Plaintiff further argues that the doctrine of adverse domination enables him to bring his claim.  "Adverse domination is an equitable doctrine that tolls the statute of limitations for claims by a corporation against its officers and directors while the corporation is controlled by those wrongdoing officers or directors."  *Lease Resolution Corp. v. Larney*, 719 N.E.2d 165, 170 (Ill. App. 1999).  Plaintiff's argument is moot, because, as discussed above, Peabody does not have standing to bring claims against Insurer Defendants.  But even if he did have standing, Peabody has conceded that his claims are time-barred.  Adverse domination cannot overcome that defect because it is completely inapplicable here; this is not a suit filed by a corporation, and Insurer Defendants were not officers or directors of RIC.  Plaintiff's argument therefore fails.

## IV.    DAMAGES/REMEDIES

Plaintiff's remaining claims relate to his damages and remedies under ERISA. Under ERISA law, the Plaintiff bears the burden of showing that he suffered harm as a result of any breaches of fiduciary duty. *Kamler,* 305 F.3d at 681. Plaintiff clearly suffered a harm here, as he has yet to receive any payment for the stock sold to RIC during the Loan transaction.

Under ERISA, a claimant is only entitled to recover the loss of any Plan benefit. 29 U.S.C. § 1132(a)(1)(B). This Court finds it proper to return Plaintiff to the place he should have been had the fiduciaries not breached their duties. Defendants' earliest breach was their valuation of RIC stock each time the Plan conducted a purchase on Plaintiff's behalf. However, Plaintiff does not introduce any evidence of damages that can be attributed to this breach. The next breach was Defendants' failure to meet their duty of prudence in diversifying Plaintiff's holdings as RIC's stock price declined between 2001 to 2003. Therefore, Peabody's damages will be assessed on that basis.

Plaintiff's failure to show any proper evaluation of the fair market value through expert testimony means that there is little evidence for determining what losses can be attributed to any breaches of fiduciary duty. He now claims that the proper amounts for purpose of determining damages should be 835 shares at $550 per share for a total of $459, 250. The basis for that price is the share value stated in Peabody's December 31, 2003 Plan Statement. According to Defendants, this was the net asset value of RIC stock in 2003. This is not the appropriate rate at which to calculate damages, because Plaintiff seeks relief based on the theory that the failure to modify his Plan holdings from 2001 onward was a breach. Instead, he should be restored to his position in 2001. I do not accept the net asset value contained in his Plan Statement for that year

as the fair market value of RIC stock, because I cannot conclusively determine that these two figures are one and the same.  But what can be determined is that the fair market value of RIC stock was at least $500 in 2001, because the Plan purchased five shares of RIC at this rate on Plaintiff's behalf.  Therefore, Plaintiff's damages should be calculated at 835 shares at $500 per share, for a total of $417,500.

Plaintiff further seeks prejudgment interest for the period when he should have received his distribution, January 30, 2004, until the present.  The award of prejudgment interest falls within the discretion of the Court, and is "a question of fairness … answered by balancing the equities."  *Fritcher v. Health Care Servs. Corp.,* 301 F.3d 811, 820 (7th Cir. 2002).  Prejudgment interest is "presumptively available to victims of federal law violations.  Without it, compensation of the plaintiff is incomplete…"  *Gorenstein Enterprises, Inc. v. Quality Care – USA, Inc.,* 874 F.2d 431, 436 (7th Cir. 1989).  Prejudgment interest has been awarded in numerous ERISA cases.  *See, e.g, Lorenzen v. Employees Retirement Plan of Sperry & Hutchinson Co.,* 896 F.2d 228, 236 (7th Cir. 1990); *Rivera v. Benefit Trust Life Ins. Co*., 921 F.2d 692, 696 (7th Cir. 1991)("[The] presumption in favor of prejudgment interest awards is specifically applicable to ERISA cases").  Defendants do not contest the award of prejudgment interest.  Therefore, we will grant Plaintiff's request for interest.  The Seventh Circuit has suggested awarding interest at the prime rate.  *See Gorenstein,* 874 F.2d at 436; *Fritcher,* 301 F.3d at 820.  The prime rate of interest, as reported by the *Wall Street Journal,* is currently 3.25%.  Compounded quarterly, *see Gorenstein,* 874 F.2d at 437, we arrive at a figure of $89,101.82 of interest.  Therefore, the total award is $506,601.82.

As stated earlier, Kole, Davis, and RIS are jointly and severally liable as co-fiduciaries

under 29 U.S.C. § 1105. Furthermore, under 29 U.S.C. § 1109, they are personally liable to restore the damages award to Plaintiff's Plan account. Therefore, Defendants RIS, Kole, and Davis are found jointly and severally liable in the amount of $506,601.82. All other claims related to damages are moot.

**III.    CONCLUSION**

After carefully reviewing the evidence in this case, this Court concludes that judgment on Counts III, IV, VI, VII, VIII, XI, XII, XIV, XV, XVI, XVII, XVIII, and XIX will be entered in favor of Plaintiff. All other Counts are decided in favor of the Defendants. Judgment in the amount of $506,601.82 will be entered in favor of Plaintiff and against Defendants RIS, Kole, and Davis.

Enter:


/s/ David H. Coar
United States District Judge

Dated: **September 2, 2009**